Receipt number AUSFCC-11461654

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SOUTHERN OREGON FOREST RESTORATION COLLABORATIVE,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

Case No. 26-1349 C

## COMPLAINT

1. Plaintiff Southern Oregon Forest Restoration Collaborative (SOFRC) is a non-profit dedicated to improving forest health and mitigating wildfire risks in Southwest Oregon. SOFRC's work aims to promote resilient landscapes, thriving communities, wood manufacturing, and workforce development.

2. On July 9, 2024, the Environmental Protection Agency (EPA) entered into a cooperative agreement with SOFRC awarding the organization $351,968 to coordinate fire education and youth workforce development programs. The terms and conditions of this agreement imposed binding contractual obligations on both SOFRC and the EPA.

3. SOFRC was required to provide fire education and youth workforce development programming, make progress toward achieving specific benchmarks, communicate with EPA program officers every month, attend EPA training workshops, and submit semi-annual performance reports. The EPA, subject to a few narrow exceptions, was required to continue disbursing the funds obligated by the award until the award period ended.

4. SOFRC lived up to its end of the bargain. Working collaboratively with its partners, SOFRC planned, coordinated, and launched fire education and youth workforce development programming across multiple counties in Southwest Oregon. SOFRC completed or made significant progress toward completing all benchmarks. SOFRC regularly reported its progress to its grant officer, who never expressed concerns about SOFRC's activities or its compliance with the terms of the award.

5. But after President Trump allowed the Department of Government Efficiency to seize control of the federal government's grantmaking apparatus, the EPA walked away. Without advance notice, the EPA first suspended SOFRC's ability to withdraw funds obligated by the award to cover programmatic activities, then ordered SOFRC to stop the work it was legally obligated to perform, and then unilaterally terminated its cooperative agreement.

6. The EPA's boilerplate explanation for its actions had nothing to do with SOFRC. Instead, the EPA claimed that its award to SOFRC conflicted with its supposed policies of "prioritizing merit, fairness, and excellence," avoiding "fraud, abuse, waste, and duplication," and serving "the best interests of the United States." The EPA did not locate these supposed policies anywhere in the grant agreement or in federal law, nor explain why or how SOFRC's grant failed to advance them.

7. The EPA's cooperative agreement with SOFRC was a contract. Under that contract's terms, the EPA had no authority to withhold already obligated funding based on a conclusory determination, unsupported by any evidence or explanation, that respecting the terms of its cooperative agreement with SOFRC would conflict with various newfound policies. The EPA's decision to breach its contract with SOFRC was arbitrary, capricious, an abuse of discretion, made in bad faith, and contrary to law, and caused significant financial and reputational damage to SOFRC.

8. The federal government may not disregard contracts simply because control of the executive branch changes hands or its officials change their minds. If it could, the government's ability to serve the American people would grind to a halt—

few organizations, let alone small nonprofits like SOFRC, would perform services for an entity that could ignore its legal obligations on a whim without consequence or accountability. SOFRC brings this action under the Tucker Act, 28 U.S.C. § 1491(a), to recover damages for the government's unlawful breaches of its contractual agreement with a non-profit partner who did nothing except deliver exactly what the government asked for.

## Parties

9. SOFRC is a 501(c)(3) non-profit, non-partisan organization founded in 2005 and headquartered in Jacksonville, Oregon. Throughout its history, SOFRC has received numerous federal grants. Until 2025, SOFRC never had a federal grant suspended or terminated prior to the end of an award period for any reason.

10. The United States is the Defendant pursuant to 28 U.S.C. § 1491.

## Jurisdiction

11. This Court has subject-matter jurisdiction under 28 U.S.C. § 1491(a) because Plaintiff's claim is founded upon a contract with the United States.

## SOFRC's Efforts to Mitigate Wildfire Risk Through Active Forest Management That Supports the Local Economy

12. SOFRC has long worked to reverse poor forest conditions that contribute to intense wildfires in Southern Oregon. These abnormally destructive wildfires have severe consequences for the environment, the economy, and local residents—they destroy wildlife habitats, poison the region's air and water, threaten its wood manufacturing infrastructure, and cause respiratory and other illnesses. SOFRC

brings together community leaders, forestry experts, governments, landowners, and businesses to develop and implement modern wildfire risk mitigation strategies.

13. For example, in the 2010s, SOFRC coordinated the development of the Rogue Basin Cohesive Forest Restoration Strategy, a modern, data-driven approach to managing wildfire risk that emphasizes the importance of ecologically informed forest thinning (strategically cutting down and removing trees) and fuel reduction (removing vegetation, shrubs, and downed branches from the forest floor).

14. The Rogue Basin Cohesive Forest Restoration Strategy was funded by a collaborative involving numerous federal government agencies and officials, including the Bureau of Land Management and U.S. Forest Service. The strategy was "designed to inform and support the federal land management agencies, the State of Oregon, and private landowners."

15. The Rogue Basin Cohesive Forest Restoration Strategy modeled the impact of its proposed activities and found that a $30 million investment could reduce overall wildfire risk by more than a third. In addition to significant ecological and safety benefits, achieving this reduction would allow timber manufacturers to produce an additional "66 million board feet of merchantable timber every year," contributing to "1,700 direct and indirect jobs that produce $65 million in local wages[] and generate over $260 million in local economic output."

16. In subsequent years, SOFRC launched other initiatives that, like the Rogue Basin Cohesive Forest Restoration Strategy, sought to mitigate wildfire risk

using modern forest management practices that benefited residents, protected the forest ecosystem, and helped grow the local economy.

17. With support from the U.S. Department of Agriculture and U.S. Forest Service—along with a coalition of partner organizations that included local education institutions and the Oregon Forest Resources Institute, a state agency that supports the timber industry—SOFRC coauthored and piloted a high school curriculum called Fire Bright to introduce students to careers in forestry and fire management.

18. SOFRC later expanded the Fire Bright program to include a Wildland Firefighting Career and Technical Education program at a local high school, and certification programs and partnerships with a local community college. Students who obtain these certifications can immediately enter the workforce, either at state and federal forest management agencies or with private firefighting contractors.

19. SOFRC is currently developing similar career-connected programming at two additional high schools, with the goal of building a regional wildland fire workforce pathway.

20. SOFRC convened a dozen organizations—including governmental entities, universities, nonprofits, and local businesses—to implement similar wildfire education and workforce development programs across Southern Oregon.

21. SOFRC facilitated a student-led effort to implement active forest management principles in Jackson and Josephine Counties. Through this effort, students worked to reduce fuel loads and improve community defensible spaces to mitigate wildfire risk and restore local forests.

22. In a project partially funded by the Bureau of Land Management, SOFRC coordinated and implemented a plan "to reduce fuels along evacuation routes so that, when a fire occurs, roadside heat would be mild enough for people to leave and for emergency responders to enter." By conducting extensive roadside thinning, SOFRC's project "also benefit[ed] fire responders – a lower, slower fire allows responders to see the progress of the fire and strategize their actions, with more time to consider and implement decisions."

23. SOFRC led a team in the Rogue Basin to develop a forest restoration project under the U.S. Forest Service's Collaborative Forest Landscape Restoration Program. This project resulted in ten years of funding for wildfire risk mitigation on U.S. Forest Service landscapes, including "101,465 acres of hazardous fuels reduction accomplished through mechanical thinning and prescribed fire."

24. The Rogue Basin project received support from the timber industry and was expected to generate significant "harvested commercial timber by-product over 18,130 treatment acres on National Forest System lands." SOFRC continues to monitor implementation of landscape treatments throughout the Rogue Basin.

25. Through these and similar efforts, including its cooperative agreement with the EPA, SOFRC aims to educate students, landowners, businesses, and communities that fuel reduction and forest thinning are essential components of healthy forest management and fire regimes, and to cultivate a workforce willing and able to perform the active forest management work that Southern Oregon's forests (and economy) will depend upon in the coming years.

## The Trump Administration's Approach to Mitigating Wildfire Risks and Supporting Local Economies

26. The Trump Administration has, publicly and repeatedly, endorsed active forest management practices that prioritize forest thinning, fuel reduction, and alignment with the needs of local communities and the timber industry.

27. President Trump has long touted the need for active forest management to mitigate the risk and severity of wildfires. As far back as 2018, President Trump named poor forest management as a significant contributor to wildfires in California.

28. During an interview in July 2026, in the aftermath of significant forest fires in Canada, President Trump reiterated his belief that forest fires are "really [a] forest management" issue.

29. Indeed, President Trump and members of his administration have called for the exact same forest management tactics SOFRC has helped to implement in Southern Oregon.

30. At a roundtable held on January 24, 2025—in the aftermath of devastating wildfires in Los Angeles—President Trump stated that "the problem is fuel. It's the fuel, the vegetation, the dry grasses, the chaparral. . . . [T]here's a tremendous amount of it, and we're not doing enough . . . to remove it."

31. On March 12, 2025, EPA Administrator Lee Zeldin issued a press release announcing a rulemaking effort designed to "ensur[e] the best forest management practices while protecting health and the environment." The goal was to "ensure that EPA doesn't get in the way of making preventative efforts . . . easier to protect communities."

32. On June 12, 2025, President Trump issued an executive order aiming to "empower State and local leaders by streamlining Federal wildfire capabilities to improve their effectiveness and promot[e] commonsense, technology-enabled local strategies for land management and wildfire response and mitigation."

33. In a section titled "Encouraging Local Wildfire Preparedness and Response," the order directed the Secretary of the Department of Agriculture to "expand and strengthen the use of partnerships, agreements, compacts, and mutual aid capabilities that empower Federal, State, local, tribal, and community-driven land management that reduces wildfire risk and improves wildfire response."

34. In a section titled "Strengthening Wildfire Mitigation," the order directed government officials to "consider promoting, assisting, and facilitating . . . innovative uses of woody biomass and forest products to reduce fuel loads in areas at risk of wildfires."

35. President Trump has also recognized the importance of the timber industry to the health of America's forests.

36. On March 1, 2025, President Trump issued an executive order declaring that "[t]he production of timber, lumber, paper, bioenergy, and other wood products (timber production) is critical to our Nation's well-being," explaining that "forest management and wildfire risk reduction projects can save American lives and communities."

37. This order directed the Bureau of Land Management and U.S. Forest Service to issue new guidance and set targets to support "timber production, forest management, and wildfire risk reduction treatments."

38. Recently, the Trump Administration announced that it was seeking to rescind a rule that blocked logging and other development on national forest lands, claiming that this "one-size-fits-all restriction . . . served as a barrier to reducing wildfire risk across the nation's national forests."

39. As the Chief of the U.S. Forest Service explained, "[a]ctive forest management is not an option. It's essential." By allowing for more "hazardous fuels reduction treatments," the rule change would mitigate "wildfire hazard potential."

40. Officials claimed that this effort "would shift more decision-making to local forest managers 'who know the land best' and could consider local conditions when making management decisions."

41. The Trump Administration has also sought to increase the ranks of federal, state, and local firefighters.

42. In a briefing on June 10, 2025, Secretary of the Department of Agriculture Brooke Rollins explained that "[t]he need for firefighters and fire support personnel is clear," citing "forest overgrowth and accumulated fuels as key drivers of wildfire intensity."

43. At the same briefing, Trump Administration officials described their efforts to increase timber harvesting to "support[] rural economies while reducing the severity of fires," and touted their "work[] to reduce hazardous fuels."

44. This effort is consistent with the Trump Administration's broader emphasis on building vocational and technical career pathways that prepare high school graduates to directly enter the workforce.

45. On February 3, 2025, the Trump Administration declared February "Career and Technical Education Month." In a statement, President Trump claimed that his administration would "put[] America first and invest[] in the best training and retraining opportunities that will result in a stronger workforce and a booming economy," including by "equip[ping] our people with real skills for real careers that our communities are in desperate need to fill" and "expand[ing] access to high-quality career and technical education for all Americans."

46. In a subsequent report describing the Trump Administration's workforce development strategy, officials emphasized the need to "invest earlier and more intentionally in building career pathways, starting in middle school with real exposure to real occupations and extending through high school and beyond with . . . industry-aligned training."

47. According to this report, the government would advance funding "to incentivize educational programs that align to local workforce needs," including programs that "provide a progression of career immersion activities aligned to jobs that are in demand at the local, state, and national level."

**<u>The EPA Executes a Cooperative Agreement with SOFRC</u>**

48. Since 2003, the EPA has administered the Environmental Justice Collaborative Problem-Solving Cooperative Agreement Program (EJCPS). Through

the EJCPS, the EPA makes grant funding available to partners engaged in community-based methods for addressing pressing environmental and health issues.

49. In 2022, Congress enacted the Inflation Reduction Act ("IRA"). Section 60201 of the IRA amended the Clean Air Act to establish the Environmental and Climate Justice Block Grant Program and funded it with a $2.8 billion appropriation. *See* Pub. L. No. 117-169, § 60201, 136 Stat. 1818, 2078-79 (codified into Section 138 of the Clean Air Act, 42 U.S.C. § 7438).

50. Under Section 7438 of the Clean Air Act, as amended by the IRA, Congress mandated that this $2.8 billion "remain available until September 30, 2026, to award grants . . . that benefit disadvantaged communities" by funding activities including "mitigating climate and health risks from . . . wildfire events." 42 U.S.C. §§ 7438(a)(1), (b)(1)-(2).

51. To carry out its mandate under Section 7438 of the Clean Air Act, the EPA made some of the funding Congress appropriated for the Environmental and Climate Justice Block Grant Program available to grantees under the EJCPS.

52. According to the EPA, the purpose of the EJCPS was to "provide[] funding to support community-based organizations in their efforts to collaborate and partner with local stakeholder groups (e.g., local businesses and industry, local government, medical service providers, and academia)."

53. In administering the EJCPS, the EPA would give "special consideration to high-ranking proposals to be performed in rural areas."

54. On April 14, 2023, SOFRC applied for funding under the EJCPS. *See* Exhibit A (Grant Application).

55. In its application, SOFRC proposed a project to develop and implement a "[c]ollaboratively planned fire education for K-12th grade students and youth workforce training and development in Southern Oregon" to "achieve the mission set forth in the National Cohesive Wildfire Strategy for Fire-Adapted Communities," a wildfire risk mitigation strategy jointly developed by the Department of Agriculture and the Department of the Interior.

56. Building off its successful development of the Fire Bright curriculum, SOFRC's project aimed to provide students in rural communities with "comprehensive wildfire resilience education that creates a pathway for careers in wildland fire and forestry."

57. SOFRC proposed that it would coordinate with project partners including the U.S. Forest Service and Bureau of Land Management, the Rogue Valley Workforce Partnership, other nonprofits, and state and local education authorities.

58. SOFRC committed to providing rural K-12 students with "education pathways and training opportunities that provide for certifications for career development, and paid internship opportunities" in wildland fire and forestry.

59. On July 9, 2024, the EPA executed a cooperative agreement awarding SOFRC $351,968 to carry out its proposed fire education and youth workforce training project over a two-year period. *See* Exhibit B (Cooperative Agreement).

60. The cooperative agreement specified that it was "subject to applicable EPA regulatory and statutory provisions" and "all terms and conditions of this agreement and any attachments."

61. Upon receiving its award from the EPA, SOFRC began drawing down funds to support implementation of the programmatic activities specified in the cooperative agreement.

62. With its partners, SOFRC provided fire education and youth workforce training to K-12th grade students, in furtherance of the mission set forth in the National Cohesive Wildfire Strategy for Fire-Adapted Communities.

63. SOFRC delivered education and training incorporating its fire education curriculum to community groups involved in implementing regional plans for mitigating wildfire risks.

64. SOFRC staff and partners contributed to Jackson County's Community Wildfire Protection Plan update—a community-led strategy for identifying and mitigating wildfire risks endorsed by the U.S. Department of the Interior—and proposed K-12 education and student participation components.

65. SOFRC collected data on the populations it served to inform SOFRC's programmatic activities, measure its performance, and help the EPA assess the wildfire risk mitigation needs for rural communities in Southern Oregon.

66. Over the life of the cooperative agreement, SOFRC completed or demonstrated significant progress toward completing all goals and activities supported by the cooperative agreement.

**The Department of Government Efficiency at the EPA**

67. During his 2024 campaign, President Trump endorsed a proposal by Elon Musk to establish a "government efficiency commission" called the "Department of Government Efficiency" or "DOGE." At a campaign rally, Musk promised DOGE would cut "at least $2 trillion" in federal spending.

68. On President Trump's first day in office, January 20, 2025, he issued Executive Order 14158, "Establishing and Implementing the President's 'Department of Government Efficiency.'" Executive Order 14158 created the "United States DOGE Service" within the Executive Office of the President and directed the heads of all federal agencies to "establish within their respective Agencies a DOGE Team of at least four employees."

69. President Trump subsequently issued four other executive orders that would shape how DOGE carried out its mission at the EPA.

70. First, President Trump issued Executive Order 14151, "Ending Radical and Wasteful Government DEI Programs and Preferencing." Executive Order 14151 directed federal agencies to "terminate, to the maximum extent allowed by law, all DEI, DEIA, and 'environmental justice' offices and positions," and to provide the Office of Management and Budget with a list of their grantees who received federal funding to "provide or advance . . . 'environmental justice' programs, services, or activities since January 20, 2021."

71. Second, President Trump issued Executive Order 14154, "Unleashing American Energy." Among other things, Executive Order 14154 revoked prior executive orders issued by President Biden establishing programs and entities to

address climate change and directed that "[a]ny contract or agreement between the United States and any third party on behalf of the[se] entities or programs . . . shall be terminated for convenience, or otherwise, as quickly as permissible under the law."

72. Third, President Trump issued Executive Order 14173, "Ending Illegal Discrimination and Restoring Merit-Based Opportunity." In Executive Order 14173, President Trump claimed that federal agencies "have adopted and actively use dangerous, demeaning, and immoral race- and sex-based preferences under the guise of so-called 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA)." He asserted that these policies "violate the text and spirit of our longstanding Federal civil-rights laws." Executive Order 14173 further directed all agencies "to terminate all discriminatory and illegal preferences, mandates, policies, programs, activities, guidance, regulations, enforcement actions, consent orders, and requirements."

73. Fourth, on February 26, 2025, President Trump issued Executive Order 14222, "Implementing the President's 'Department of Government Efficiency' Cost Efficiency Initiative." In Executive Order 14222, President Trump directed the heads of federal agencies to work "in consultation with the agency's DOGE Team Lead . . . [to] terminate or modify . . . contracts and grants to reduce overall Federal spending or reallocate spending to promote efficiency and advance the policies of my Administration."

74. When President Trump issued Executive Order 14222, DOGE team members were already working to freeze and terminate grants they determined to be

contrary to the Trump Administration's policy priorities, including priorities articulated in President Trump's executive orders.

75. At least three DOGE employees—Kathryn Loving, Erica Jehling, and Cole Killian—were detailed to the EPA.

76. None had prior experience in environmental protection or federal grantmaking. Loving had previously worked as a biotech entrepreneur; Jehling at Elon Musk's private company, SpaceX; and Killian at a high-frequency and algorithmic trading company.

77. Loving, Jehling, and Killian received access to the EPA Acquisition System, which details all agency spending. They used this access to identify contracts that allegedly conflicted with President Trump's executive orders, including his orders targeting activities involving "DEI" and "environmental justice."

78. To identify grants for termination, DOGE team members reviewed existing funding agreements for a set of "[k]eywords" that, in their view, indicated that a funding award conflicted with the Trump Administration's policy priorities.

79. Loving, Jehling, and Killian were authorized to instruct EPA grant officers regarding what "contract actions" should be "terminated."

80. Loving, Jehling, and Killian reviewed and catalogued public tips sent to an account on X, the social media platform owned by Elon Musk, identifying allegedly wasteful or illegal grants.

81. DOGE team members also used artificial intelligence tools, including Elon Musk's Grok AI chatbot, to identify grants for termination.

82. On January 27, 2025, the EPA's acting Chief Financial Officer issued a memorandum instructing that "all disbursements for unliquidated obligations funded" under the IRA "are paused."

83. On February 5, 2025, EPA Administrator Lee Zeldin met with Loving, Jehling, and Killian "to discuss ways they can assist EPA in identifying potential misuse of funds, improving financial management, and enhancing overall efficiency."

84. On February 6, 2025, the EPA placed 168 employees in the Office of Environmental Justice on administrative leave.

85. On February 11, 2025, Loving sent an email to EPA Assistant Deputy Administrator Travis Voyles and other EPA officials with a spreadsheet containing "a list of contracts and grants that we want to push forward to cancellation, and keep the momentum going!"

86. This spreadsheet contained a column under the header "Rationale." Initially, every grant in the spreadsheet was tagged with one of three phrases in this column: (1) "Environmental justice work," (2) "DEI EO issues," or (3) "Wasteful."

87. Later, the entries tagged with "Environmental justice work" were revised to read "Program not in line with administration priorities: 66.615 - Environmental Justice Subawards."

88. On February 12, 2025, Loving followed up to inform Voyles that "the careers"—i.e., career staff at the EPA—were "ready to hit cancel" on the grant terminations DOGE had recommended. Her email also noted that DOGE had "added a new tab 'Feb 12 contracts to cancel' with a new tranche of contracts we found today."

89. On February 13, 2025, Loving informed Voyles that DOGE "added to the queue a list of 71 grants" under a new tab "called 'Feb 13 grants to cancel.'"

90. That same day, EPA Administrator Lee Zeldin announced on X that he "just cancelled a $50 MILLION Biden-era environmental justice grant to the Climate Justice Alliance."

91. On February 14, 2025, the EPA issued a press release stating that Zeldin, "with the assistance of the Department of Government Efficiency (DOGE), cancelled nine contracts related to DEI, environmental justice, and more, resulting in $59,776,673.70 in taxpayer savings."

92. On February 22, 2025, Zeldin announced on X that he "just cancelled another 21 wasteful DEI and Environmental Justice grants, with the help of our amazing @DOGE team, racking up $67M more in savings!"

93. In a statement to the New York Post, Zeldin "hailed his agency and DOGE's actions as another example of 'wasteful spending end[ing] with the Trump Administration.'"

94. On February 25, 2025, Voyles determined that the entire Environmental and Climate Justice Block Grant Program, including the EJCPS, "should be terminated for policy reasons."

95. That evening, another EPA official, Daniel Coogan, sent an email to EPA employees documenting Voyles's decision to terminate the Environmental and Climate Justice Block Grant Program and directing grant officers to "[t]erminate grants and pay final invoices."

96. That same day, the EPA issued a press release announcing that Zeldin, "with the assistance of the Department of Government Efficiency (DOGE), identified and cancelled an additional 20 grants totaling $60,958,537.30 in taxpayer savings." According to the press release, these cancellations "put[] a stop to wasteful DEI and environmental justice programs being funded by taxpayers."

97. On February 26, 2025, President Trump stated in a cabinet meeting that Zeldin planned to cut more than 65% of the EPA's workforce. The White House later clarified that Zeldin intended to cut "65% of the EPA's wasteful spending."

98. On March 3, 2025, EPA's political leadership sent an email instructing all division directors and deputy directors that "any assistance agreement, contract, or interagency agreement transaction $50,000 or greater must receive approval from an EPA DOGE Team member."

99. The email ordered grant program officers to "complete and sign" an "[Executive Order] Compliance Review Form for all funding actions," which required program officers to certify that any approved funding "does not conflict with [President Trump's] Executive Orders."

100. To comply with these directives, EPA employees sent requests to disburse funding directly to Loving, Jehling, and Killian for "review and approval."

101. That same day, a member of the EPA's Office of General Counsel distributed an email to employees regarding the ongoing series of grant and cooperative agreement terminations (the "OGC Email").

102. The OGC Email explained that all grant and cooperative agreement recipients would receive a version of the same memorandum explaining their terminations. All termination memoranda would "contain standard language identifying the following bases for the grant being terminated as inconsistent with Agency priorities."

103. The bases for termination identified in the OGC Email were that a grant or cooperative agreement "conflict[s] with the Agency's policy of prioritizing merit, fairness, and excellence," is "not free from fraud, abuse, waste, or duplication," and "fail[s] to serve the best interests of the United States."

104. The OGC Email acknowledged that a grant or cooperative agreement recipient who received this boilerplate explanation for a termination was likely to "raise certain common arguments" in response, including that "EPA has not made a particularized showing that recipient has violated a term of the award and is not free from fraud, abuse, waste, or duplication."

105. The OGC Email instructed that if a grant officer received such a complaint, they should "[r]eview the information pertinent to the grant at issue to determine whether there are facts that would support a particularized justification" for termination. If so, the grant officer should "[d]ocument the basis for the justification" and "[u]phold the termination on those grounds."

106. However, if the grant officer "[d]etermines that no particularized justification would support termination," then the grant officer should "[d]ecide the dispute in favor of the [grant or cooperative agreement] recipient."

107. On March 4, 2025, Jehling emailed an EPA spokesperson sharing that "we obtained alignment with political leadership to cancel 21 grants totaling $116M."

108. That same day, the EPA issued a press release announcing that Zeldin, "with the assistance of the Department of Government Efficiency (DOGE), identified and cancelled another 21 grants amounting to $116,449,761 total immediate taxpayer savings." The press release claimed that these cancellations were "aligned with President Trump's commitment to safeguard human health and the environment while reviving the economy."

109. On March 7, 2025, Voyles instructed staff that the EPA was "proceeding with cancelling" all grants and cooperative agreements awarded under the Environmental and Climate Justice Block Grant Program.

110. On March 10, 2025, Administrator Zeldin announced "the fourth round of EPA-DOGE partnered cancellations." The EPA, "[w]orking hand-in-hand with DOGE to rein in wasteful federal spending," had "identified and cancelled more than 400 additional grants across nine unnecessary programs totaling $1.7 billion in savings for the American people."

111. On March 12, 2025, Zeldin announced that the Office of Environmental Justice and External Civil Rights, the Environmental Justice Division within all EPA regional offices, and the Office of Inclusive Excellence within the Office of Mission Support were being terminated. The EPA claimed that these terminations were necessary to bring EPA into compliance with President Trump's executive orders.

112. On April 8, 2025, Reuters reported that DOGE team members were using artificial intelligence tools to monitor EPA employees' communication apps and software "for anti-Trump or anti-Musk language." The purpose of this monitoring was to identify "people whose work did not align with the administration's mission."

113. On April 11, 2025, a DOGE employee named Luke Farritor locked EPA officials out of the website used to administer grant opportunities, grants.gov, and instructed employees that all grants must instead be sent to a new email address for review and approval by DOGE employees.

114. In or around June 2025, the EPA's DOGE team disbanded and departed the agency. Loving, Jehling, and Killian all returned to the private sector.

**EPA Suspends and Cancels SOFRC's Cooperative Agreement**

115. As DOGE worked to implement widespread grant terminations at the EPA, SOFRC continued to deliver education and workforce development programming across Southern Oregon. But DOGE's wholesale overhaul of the EPA's grantmaking process quickly jeopardized SOFRC's ability to carry out the activities it was legally obligated to carry out under the terms of its cooperative agreement.

116. On January 30, 2025—a few days after the EPA "paused" disbursements funded by IRA appropriations—SOFRC's EPA award disappeared from the Automated Standard Application for Payments (ASAP), a payment system maintained by the Treasury Department that enables the federal government to disburse money to (and receive money from) external entities.

117. On February 7, 2025, SOFRC's EPA grant officer, Scott Schlief, asked SOFRC to put together an "elevator pitch" for its grant that contained "a very succinct

summary of your project and a few bullet points of your accomplishments to date and any upcoming major milestones or event[s].”

118. On February 10, 2025, Schlief emailed SOFRC to ask whether the organization had “managed to get access to the ASAP system yet.” Schlief notified SOFRC that EPA administrators were “compiling a list of grantees that still need access restored.”

119. Shortly thereafter, SOFRC’s access to the ASAP disbursement system was temporarily restored.

120. However, on March 3, 2025, SOFRC’s EPA award again disappeared from the ASAP disbursement system. From this point forward, SOFRC was unable to draw down any of the funds the EPA obligated when it executed SOFRC’s award.

121. Because SOFRC had not received any official termination or suspension letter at this point, SOFRC was required to (and did) continue providing education and workforce development programming in accordance with the terms of its agreement with the EPA, despite being unable to draw down funds under its award.

122. According to documents later obtained by the Office of U.S. Senator Adam Schiff, EPA’s cooperative agreement with SOFRC was among the “400 additional grants” targeted for cancellation that EPA Administrator Lee Zeldin referred to in his March 10th press release announcing “the fourth round of EPA-DOGE partnered cancellations.”

123. SOFRC’s grant application contained some of the keywords that DOGE identified as conflicting with President Trump’s policy priorities—including

"advocate," "barriers," "diversity," "equity," "inclusion," "indigenous," and "underserved"—and which DOGE employees used to select grants for termination.

124. On March 13, 2025, SOFRC emailed Schlief asking what the "official status is of the EPA Grant." SOFRC noted that it "had not received a termination letter; however, the grant is no longer in ASAP."

125. On March 26, 2025, an EPA Grants Management Officer, Andrea Manion, emailed SOFRC to inform the organization that the EPA was terminating its cooperative agreement. Manion's email began with the generic greeting, "Dear EPA Grant Recipient."

126. In an attachment, Manion provided SOFRC with a memorandum purporting to explain the EPA's decision to terminate its cooperative agreement. *See* Exhibit C (Termination Memo).

127. The termination memo contained only three references specific to SOFRC: the memo's subject line referenced the number of the cooperative agreement being cancelled; the memo's header identified SOFRC's Executive Director as the recipient; and the memo's first paragraph identified SOFRC as the organization whose award was being terminated.

128. The termination memo informed SOFRC that its grant was being "terminated in its entirety effective immediately on the grounds that the award no longer effectuates the program goals or agency priorities. The objectives of the award are no longer consistent with EPA funding priorities."

129. The termination memo stated that "[t]he EPA Administrator has determined that, per the Agency's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Agency's grants do not conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions. In addition to complying with the law, it is vital that the Agency assess whether all grant payments are free from fraud, abuse, waste, and duplication, as well as to assess whether current grants are in the best interests of the United States."

130. Finally, the termination memo stated that "[t]he grant specified above provides funding for programs that promote initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is inconsistent with, and no longer effectuates, Agency priorities."

131. The reasons the EPA gave for terminating SOFRC's cooperative agreement were identical to the reasons provided in the OGC Email to justify mass terminations of EPA grants and cooperative agreements.

132. The termination memo provided no assessment of, or any reference to, the programmatic activities SOFRC carried out under its cooperative agreement.

133. The termination memo provided no explanation regarding how SOFRC's programmatic activities purportedly conflicted with the EPA's policy "of prioritizing merit, fairness, and excellence in performing our statutory functions."

134. The termination memo did not identify where in SOFRC's cooperative agreement or in federal law this policy "of prioritizing merit, fairness, and excellence" was codified or defined.

135. The termination memo provided no explanation regarding how SOFRC's programmatic activities purportedly conflicted with the EPA's policy of remaining "free from fraud, abuse, waste, or duplication."

136. The termination memo did not identify where in SOFRC's cooperative agreement or in federal law this policy of remaining "free from fraud, abuse, waste, or duplication" was codified or defined.

137. The termination memo provided no explanation regarding how SOFRC's programmatic activities purportedly conflicted with the EPA's policy of only disbursing grant funding that "serve[s] the best interests of the United States."

138. The termination memo did not identify where in SOFRC's cooperative agreement or in federal law this policy of only disbursing grant funding that "serve[s] the best interests of the United States" was codified or defined.

139. With the exception of information identifying SOFRC and its cooperative agreement with the EPA, the termination memo Manion sent to SOFRC was identical to the termination memoranda EPA sent to hundreds of other grantees whose grants were terminated around this time.

140. In a separate attachment, Manion provided SOFRC with an amended award setting the EPA's funding level to $0, ordering SOFRC to stop work, and stating that the EPA was "asserting its right under 2 CFR 200.340 and the

Termination General Term and Condition of this agreement to unilaterally terminate this award." *See* Exhibit D (Amended Award).

141. On April 23, 2025, pursuant to 2 C.F.R. § 1500.15, SOFRC appealed the EPA's termination decision on the grounds that "the reason[s] given for terminating this grant [are not] allowed under the terms and conditions of our grant or under existing law." SOFRC sent its appeal to Mickey Reagan, the EPA's Disputes Decision Official, cc'ing Manion. *See* Exhibit E (Termination Appeal).

142. On August 29, 2025, an EPA Grants Dispute Decision Official, Emma Pokon, dismissed SOFRC's appeal. *See* Exhibit F (Appeal Dismissal).

143. On September 12, 2025, pursuant to 2 C.F.R. § 1500.16, SOFRC filed a petition for reconsideration of the dismissal of its appeal. *See* Exhibit G (Petition for Reconsideration).

144. On September 26, 2025, Pokon denied SOFRC's petition for reconsideration. *See* Exhibit H (Denial of Petition for Reconsideration).

145. In adjudicating SOFRC's appeal, the EPA did not provide any evidence substantiating its prior assertion that its award to SOFRC conflicted with the Trump Administration's priorities. Nor did the EPA provide any explanation substantiating its assertion that it was lawfully permitted to terminate SOFRC's award under the terms and conditions of the grant agreement.

146. Instead, the EPA's sole basis for dismissing SOFRC's appeal was that the enactment of the One Big Beautiful Bill Act, Public Law 119-21, on July 4, 2025, "legally unobligated" funds the EPA awarded to SOFRC when it executed its grant

agreement on July 9, 2024, such that the EPA could not "offer reinstatement" of SOFRC's award.

147. The One Big Beautiful Bill Act only rescinded funds which were unobligated at the time of the bill's passage. *See* Pub. L. No. 119-21, 139 Stat. 72 (July 4, 2025) ("The *unobligated* balances of amounts made available to carry out section 138 of the Clean Air Act (42 U.S.C. § 7438) are rescinded." (emphasis added)).

148. On October 6, 2025, SOFRC sent the EPA a letter communicating its view that the EPA could not lawfully close out the cooperative agreement "because [the] EPA improperly and unilaterally froze our access to funding and is seeking to unlawfully terminate our grant prematurely." The letter further advised that SOFRC would "pursue litigation and any other available legal avenues" to challenge the EPA's actions.

149. However—under protest and at all times asserting that it contested and would continue to contest the legality of EPA's decision to terminate its grant—SOFRC eventually completed the EPA's closeout process in accordance with the EPA's demands in order to minimize the harms resulting from the EPA's unlawful termination of SOFRC's cooperative agreement.

## **SOFRC Incurred Damages as a Direct Result of DOGE and the EPA's Unlawful Actions**

150. SOFRC suffered at least six categories of damages as a direct result of the government's unlawful suspension and termination of its cooperative agreement.

151. First, SOFRC was entitled to receive the full benefit of its bargain in entering into a cooperative agreement with the EPA. In entering into its agreement

with the EPA, SOFRC reasonably expected to receive the full amount that it would have received over the life of the terminated award but for the EPA's breaches of the cooperative agreement.

152. Thus, SOFRC's damages include "the difference between the amount[] [it] should have received under [its] contract[] and the amount[] [it] actually received." *See Boaz Housing Auth. v. United States*, 994 F.3d 1359, 1363, 1369–70 (Fed. Cir. 2021).

153. The EPA has previously recognized and publicly represented that upon executing a grant or cooperative agreement, the recipient reasonably expects to receive—and the federal government reasonably expects to disburse—the amount of money obligated by the grant or cooperative agreement.

154. When calculating the amount of "savings" a grant or cooperative agreement termination yielded for the federal government, DOGE employee Kathryn Loving instructed EPA officials to count the maximum dollar amount that a recipient could have received from the government under the terms of the cancelled grant or cooperative agreement.

155. EPA officials, including Administrator Zeldin, did exactly that when communicating to the public the amount of purported government savings resulting from their actions terminating hundreds of grants and cooperative agreements.

156. Second, SOFRC suffered damages in the form of expenditures the organization was required to make due to the EPA's unlawful suspension and termination of its cooperative agreement. These expenditures included, but were not

limited to, significant allocations of staff time to respond to the EPA's actions throughout the unlawful suspension and termination process, manage the financial crisis occasioned by the sudden loss of funding awarded under the cooperative agreement, and to identify and secure alternative sources of funding that could have been used for other mission-aligned purposes but for the EPA's unlawful breaches.

157. Third, SOFRC suffered damages from the loss of the indirect cost recovery it would have received but for the EPA's breaches. SOFRC's approved indirect cost rate was built into the award amount, and the EPA's termination deprived SOFRC of the indirect cost recovery on the portion of the award that remained to be performed, costs that SOFRC continued to bear in maintaining the organizational capacity needed to continue delivering programmatic activities where immediate cessation was impossible or infeasible.

158. Fourth, SOFRC suffered damages in the form of being forced to forego mission-aligned activities because it was required to redirect funding to cover significant budget gaps that directly resulted from the EPA's unlawful breaches. But for the EPA's unlawful breaches, SOFRC would have undertaken these activities in addition to, and alongside, activities funded by the cooperative agreement.

159. Fifth, the government's breaches have caused substantial damage to SOFRC's reputation, brand, and goodwill. SOFRC's work under the cooperative agreement involved close partnerships with other non-profits, local and governmental entities, education institutions, and local businesses. The government's breaches harmed SOFRC's ability to maintain these partnerships.

160. Sixth, SOFRC has suffered reliance damages that it is entitled to recover in the alternative. SOFRC hired employees, entered into partnership agreements, purchased materials and supplies, and undertook other contractual obligations in reasonable reliance on the government fulfilling its obligations under the EPA's cooperative agreement. SOFRC has suffered out-of-pocket losses from these costs due to the EPA's breaches.

## **Claim for Relief**

***Count One*: Breach of Contract**

161. Plaintiff realleges each and every allegation set forth in the preceding paragraphs as if set out fully herein.

162. Plaintiff's cooperative agreement with the EPA was a valid and enforceable contract.

163. At all times, SOFRC carried out the programmatic activities it was lawfully obligated to carry out under the terms of the cooperative agreement.

164. Neither EPA Administrator Zeldin nor any other EPA official conducted an individualized review of SOFRC's programmatic activities prior to suspending, ordering work to stop on, and terminating the cooperative agreement.

165. The EPA failed to provide a reasoned explanation for why it was suspending, ordering work to stop on, and terminating SOFRC's cooperative agreement.

166. The EPA did not assess SOFRC's programmatic activities and consider whether they were consistent with its lawful priorities.

167. The EPA lacked authority to terminate SOFRC's grant on the grounds that the agency's policy priorities had changed since the time the EPA initially executed SOFRC's cooperative agreement.

168. The EPA lacked authority to terminate SOFRC's cooperative agreement based on asserted policy priorities that were neither codified nor defined anywhere in the cooperative agreement's terms and conditions.

169. Even if the EPA possessed such authority, the EPA failed to provide SOFRC with any evidence of, or a reasoned explanation as to why, the activities SOFRC performed under its cooperative agreement with the EPA were contrary to the agency's policy priorities or otherwise unlawful.

170. The EPA lacked authority to terminate all grants funded and administered under the Environmental and Climate Justice Block Grant Program, including SOFRC's, for "policy reasons" in contravention of Congress's mandate that Environmental and Climate Justice Block Grant Program funds "remain available until September 30, 2026, to award grants . . . that benefit disadvantaged communities," to support activities including "mitigating climate and health risks from . . . wildfire events." 42 U.S.C. §§ 7438(a)(1), (b)(1)-(2).

171. The EPA has, in other litigation, "admitted" that its decision to terminate all grants and cooperative agreements administered under the Environmental and Climate Justice Block Grant Program was unlawful. *See Sustainability Inst. v. Trump*, 2026 U.S. Dist. LEXIS 130418, at *15 n.4 (D.S.C. June 11, 2026).

172. The EPA suspended, ordered work stopped on, and terminated SOFRC's cooperative agreement based on its and DOGE's animus toward entities that implemented programs serving underrepresented communities and advancing environmental justice, even though those programs were authorized (and, indeed, mandated) by law.

173. The EPA lacked authority to suspend, order work stopped on, and terminate SOFRC's cooperative agreement based on its and DOGE's disagreement with and dislike of the Congressionally mandated goals of serving underrepresented communities and advancing environmental justice.

174. The EPA's unilateral decisions to suspend, order work stopped on, and terminate SOFRC's cooperative agreement were unsupported by any evidence or reasoned explanation for the agency's actions.

175. The EPA's unilateral decisions to suspend, order work stopped on, and terminate SOFRC's cooperative agreement were arbitrary, capricious, contrary to law, and undertaken in bad faith.

176. The EPA's unilateral decisions to suspend, order work stopped on, and terminate SOFRC's cooperative agreement, individually and collectively, constituted breaches of its contract with SOFRC.

177. As a result of the EPA's unlawful breaches, SOFRC has incurred monetary, reputational, and other damages, plus interest and costs and expenses.

## Prayer for Relief

Plaintiff Southern Oregon Forest Restoration Collaborative respectfully requests that this Court enter judgment in favor of Plaintiff and against the United States in the amount of Plaintiff's damages, or such other amount as to be proven at trial, as well as costs, expenses, fees, interest, and such further and other relief as this Court deems just and proper.

Respectfully submitted,

*/s/ Samuel Jacob Davis*
Samuel Jacob Davis
Charles Gerstein*
Gerstein Harrow LLP
1319 F Street NW, Suite 301
Washington, DC 20004
samdavis@gerstein-harrow.com
charlidee@gerstein-harrow.com
(631) 807-2327

* *Application for admission forthcoming*